865 F.2d 1256
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Michelle A. BALAMANI; Stuart R. Bonham, Plaintiffs-Appellees,
v.
STATE FARM FIRE AND CASUALTY INSURANCE COMPANY; Defendant-Appellant,
Nationwide Mutual Insurance Company, Defendant-Appellee.
Michelle A. BALAMANI; Stuart R. Bonham, Plaintiffs-Appellees,
v.
NATIONWIDE MUTUAL INSURANCE COMPANY; Defendant-Appellant,
State Farm Fire and Casualty Insurance Company, Defendant-Appellee.
Michelle A. BALAMANI; Stuart R. Bonham, Plaintiffs-Appellants,
v.
STATE FARM FIRE AND CASUALTY INSURANCE COMPANY; Nationwide
Mutual Insurance Company, Defendants-Appellees.
 Nos. 88-1549, to 88-1551.
 United States Court of Appeals, Fourth Circuit.
 Argued: Oct. 5, 1988.
Decided: Dec. 6, 1988.
Rehearing Denied Jan. 24, 1989.
 
 George C. Towner, Jr. (Simmonds, Coleburn & Towner, on brief), Michael Joshi (Lowry J. Miller, Miller, Miller & Kearney, on brief), for appellant.
 Rutherford C. Jennings (Slenker, Brandt, Jennings & Johnston, on brief), for appellees.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and MURNAGHAN and WILKINS, Circuit Judges.
 WILKINS, Circuit Judge:
 
 
 1
 State Farm Fire and Casualty Insurance Company and Nationwide Mutual Insurance Company appeal from a decision in favor of Michelle Balamani and Stuart Bonham involving the interpretation of certain automobile insurance policies. Bonham cross appeals from a judgment in favor of Nationwide. We reverse the judgment in favor of Balamani and Bonham and affirm the judgment in favor of Nationwide.
 
 I.
 
 2
 On May 12, 1984 Bonham was driving a 1982 GMC truck (the truck) when he was involved in an accident with Michelle Balamani. At the time of the accident title to the truck was held by James Livingston, Sr. He had a secured loan from General Motors Acceptance Corporation (GMAC) for the truck, and he was the named insured on a State Farm policy covering it. The policy provided coverage for other persons using the truck "with the permission of the named insured" (emphasis in original).
 
 
 3
 Unknown to GMAC, State Farm, or the Commonwealth of Virginia, Livingston had agreed to sell the truck to Bonham's father for the assumption of the loan payments and $3,000.00. They agreed that Livingston would transfer the title to Bonham's father when he had satisfied Livingston's note to GMAC. In the interim, Livingston continued to receive insurance and other bills for the truck, which he forwarded to Bonham's father who paid them from his business account.
 
 
 4
 At Livingston's insistence they also agreed that as long as Livingston had the legal obligation for the loan, no one under 30 years old would be allowed to drive the truck. Bonham, 19 years old at the time, knew of this restriction.[1]
 
 
 5
 The Bonhams also owned two other vehicles. Bonham's father owned a 1965 Ford tow truck (the Ford) that was inoperable at the time of the accident. He had purchased a business insurance policy from Nationwide that provided coverage for temporary substitute automobiles while the Ford was inoperable or being repaired. Bonham owned a 1967 Pontiac GTO (the Pontiac), on which he had a separate family insurance policy issued by Nationwide. This policy provided general coverage to Bonham for his use of non-owned vehicles, but excluded from its coverage the use of non-owned vehicles which were driven without permission from the owner or were used in an "automobile business." The policy defined "automobile business" as "the business or occupation of selling, repairing, servicing, storing or parking automobiles."
 
 
 6
 On the day of the accident Bonham was working on a customer's car at his father's garage when he discovered that he needed some paint. Since the truck was parked behind his Pontiac, blocking his exit, Bonham obtained his father's permission to drive it on this errand. On his return from the paint store Bonham was involved in the accident with Balamani.
 
 
 7
 After State Farm and Nationwide denied coverage for Balamani's damages, she filed suit in state court and obtained a judgment against Bonham. Balamani and Bonham then brought this action against State Farm and Nationwide to recover under the policies on the truck, the Ford, and the Pontiac.
 
 
 8
 The district court found that Bonham's father was the equitable owner of the truck and concluded that Livingston's State Farm policy on the truck covered this accident since Bonham's father gave him permission to use the truck. The district court held, alternatively, that the truck was a "temporary substitute" for the inoperable Ford and that Bonham's father's Nationwide policy on the Ford would cover the accident. Finally, the district court held that Nationwide could not be held liable on the policy covering the Pontiac since Bonham was using the truck in an "automobile business" at the time of the accident.
 
 II.
 
 9
 Balamani and Bonham sought recovery under three insurance policies. We hold that none of them provided coverage.
 
 A.
 
 10
 Virginia is a strict title state and ownership passes only with transfer of title. Va.Code Ann. Sec. 46.1-87 (1972 & Supp.1988); see Rawl's Auto Auction Sales, Inc. v. Dick Herriman Ford, Inc., 690 F.2d 422, 427 (4th Cir.1982). Although Livingston had agreed to sell the truck to Bonham's father and Bonham's father had been making the payments on Livingston's loan, title remained in Livingston's name. The conclusion by the district court that Bonham's father was an "equitable owner" of the truck constitutes error under Virginia law.
 
 
 11
 Livingston owned the truck at the time of the accident and his direction to Bonham's father not to allow anyone under 30 years old to drive it constituted a limited permission for Bonham's father to use the truck pending completion of the sale. Since Bonham drove the truck against the express prohibition of Livingston, the State Farm policy provided no coverage.
 
 
 12
 Bonham argues in the alternative that his father was the "custodian" of the truck for purposes of invoking Virginia's omnibus clause, Va.Code Ann. Sec. 38.2-2204 (1950 & Repl.Vol.1986) (formerly at Sec. 38.1-381). This section provides that no automobile insurance policy may be issued in Virginia:
 
 
 13
 [U]nless the policy contains a provision insuring the named insured, and any other person using [the vehicle] with the expressed or implied consent of the named insured, against [damages due to negligence].... [Any policy] that includes, with respect to any liability insurance ... for use of a nonowned automobile ..., any provision requiring permission or consent of the owner of [the automobile] for the insurance to apply, shall be construed to include permission or consent of the custodian in the provision requiring permission or consent of the owner.
 
 
 14
 This section extends automobile insurance coverage from an owner/named insured to a third party operator who receives permission to use a vehicle from a second party operator where the second party operates the vehicle with the consent of the owner. A third party, however, cannot be given permission by a second party where the third party has actual knowledge that the owner/named insured has expressly prohibited him from driving the vehicle. Since Bonham knew that Livingston would not allow him to drive the truck, he could not acquire coverage under Livingston's policy simply by obtaining his father's permission to use it.
 
 
 15
 Finally, Bonham argues that his father, in addition to being the equitable owner of the truck, was its "equitable named insured." He erroneously contends that State Farm was put on notice of his father's equitable ownership by the payments made by his father from his business account to State Farm prior to the accident. The State Farm policy provided a means by which the named insured could be changed, and provided coverage to a named insured upon payment of premiums. The policy did not, however, require that premiums be paid by the named insured. There could have been many reasons why Bonham's father wrote checks for Livingston. State Farm cannot be required to compare check signatures to names on policies at the risk of acquiescing to coverage of any signing individual as an "equitable insured."
 
 B.
 
 16
 The Nationwide business policy held by Bonham's father on the Ford included coverage for a "temporary substitute automobile," defined as "an auto used temporarily to replace a covered auto while it is being serviced or repaired or while it is broken down or damaged.... [I]t cannot be owned by you or anyone who lives with you." The district court concluded that the truck was covered by this provision since the Ford was inoperable at the time of the accident. In fact, the Ford was in need of substantial repair work and had been inoperable for at least five months. Although Bonham's father testified that he was planning to repair it, he had made no real effort to do so. Under these circumstances, the truck was not a temporary substitute within the meaning of the temporary substitute automobile coverage provision.
 
 C.
 
 17
 Bonham argues that he should, in any event, be covered under his insurance policy on the Pontiac. Bonham's policy provided him liability coverage for use of a non-owned vehicle "provided his actual operation ... [was] with the permission, or reasonably believed to be with the permission, of the owner." The policy excluded from coverage use of "a non-owned automobile while maintained or used by any person while such person is employed ... in (1) the automobile business of [Bonham] or of any other person ... [or] (2) any other business or occupation of [Bonham]."
 
 
 18
 Bonham claims he had a "reasonable belief" that he had implied consent to drive the truck and that the automobile business exclusion, not expressly provided for by statute, is void. These arguments are without merit. Livingston was the owner of the truck and Bonham had actual knowledge that he was expressly prohibited by Livingston from using it. Lacking permission Bonham had no coverage under the non-owned automobile section of his policy. Further, even if Bonham could have had a reasonable belief that he had Livingston's permission to drive the truck, the district court correctly concluded that the non-owned automobile business exclusion precluded coverage.
 
 III.
 
 19
 Adequate coverage could have been obtained by several different means. Bonham's father could have added the truck, even though not owned by him, to his Nationwide business policy. Alternatively, he could have named himself and Bonham, if Livingston would have agreed, as insureds on Livingston's State Farm policy. And Bonham could have purchased a business insurance policy that covered his use of non-owned vehicles and restricted his driving to vehicles he owned or had permission to use.
 
 
 20
 Nationwide and State Farm had the right to know what and whom they were insuring. Informal, unilateral policy changes such as the types for which Bonham here argues, however convenient or economical to insureds, will not bind insurance companies.
 
 
 21
 We reverse the district court judgment against State Farm because Livingston had expressly prohibited Bonham from driving his truck. We reverse the judgment against Nationwide on the business policy held by Bonham's father because the truck was not a "temporary substitute" for the Ford. We affirm the judgment for Nationwide on Bonham's policy because Bonham was using the truck in an automobile business and without Livingston's permission.
 
 
 22
 REVERSED IN PART;
 
 
 23
 AFFIRMED IN PART.
 
 
 
 [1]
 The district court found that Livingston imposed this restriction because he was under the mistaken belief that his State Farm policy would not cover drivers under 30 years old. Since both parties agreed to the restriction, however, it is immaterial why Livingston decided the restriction was necessary